DURIE TANGRI LLP
CLEMENT S. ROBERTS (SBN 209203)
croberts@durietangri.com
JOSEPH C. GRATZ (SBN 240676)
jgratz@durietangri.com
SONALI D. MAITRA (SBN 254896)
smaitra@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone: 415-362-6666
Facsimile: 415-236-6300

WILSON SONSINI GOODRICH & ROSATI
STEFANI E. SHANBERG (SBN 206717)
sshanberg@wsgr.com
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

Attorneys for Defendant and Counter Claimant
RINGCENTRAL, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J2 GLOBAL COMMUNICATIONS, INC. and ADVANCED MESSAGING TECHNOLOGIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RINGCENTRAL, INC., <br><br> Defendant. | Case No. 2:11-cv-04686-DDP -AJW <br><br> **[CORRECTED] RINGCENTRAL, INC.'S ANSWER AND COUNTERCLAIMS TO PLAINTIFFS' FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND PERMANENT INJUNCTION** <br><br> JURY TRIAL DEMANDED |
| RINGCENTRAL, INC., <br><br> Counter Claimant, <br><br> v. <br><br> J2 GLOBAL COMMUNICATIONS, INC. and ADVANCED MESSAGING TECHNOLOGIES, INC., <br><br> Counter Defendants. | Ctrm: 3, 2nd Floor <br> Judge: Honorable Dean D. Pregerson |

Defendant RingCentral, Inc. ("RingCentral") hereby replies to the allegations set forth in Plaintiffs j2 Global Communications, Inc. and Advanced Messaging Technologies, Inc.'s (collectively, "Plaintiffs") First Amended Complaint for Patent Infringement and Permanent Injunction ("Complaint") as follows:

## JURISDICTION AND VENUE

1.     RingCentral admits that the Complaint purports to recite an action for infringement under the patent laws of the United States and, therefore, that this Court has jurisdiction.

2.     RingCentral admits that venue is proper in this district and that RingCentral conducts business within the Central District of California.  RingCentral denies the remainder of the allegations in this paragraph.

## PARTIES

3.     RingCentral lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them.

4.     RingCentral admits that it is a corporation organized under the laws of the State of California, that its principal place of business is 999 Baker Way, Fifth Floor, 94404, that it does business in California, including in the Central District of California, that it has customers, to whom it provides telephone numbers, in the Central District of California, and that it provides certain Internet-based fax and voicemail services. RingCentral denies the remainder of the allegations in this paragraph.

## FACTS

5.     RingCentral admits that U.S. Patent No. 6,208,638 ("'638 Patent") is entitled "Method And Apparatus For Transmission And Retrieval Of Facsimile And Audio Messages Over A Circuit Or Packet Switched Network" and lists on its face Jack Rieley and Jaye Muller as inventors, j2 Global Communications, Inc. as assignee, and an issue date of March 27, 2001.  RingCentral further admits that a copy of the '638 Patent is attached as Exhibit A to the Complaint.  RingCentral lacks knowledge or information

1

[CORRECTED] RINGCENTRAL'S ANSWER AND COUNTERCLAIMS TO
PLAINTIFFS' FIRST AMENDED COMPLAINT / CASE NO. 2:11-CV-04686-DDP -AJW

sufficient to form a belief about the truth of the remainder of the allegations in this paragraph and, on that basis, denies them.

6.      RingCentral admits that Exhibit B appears on its face to be a December 8, 2008 Reexamination Certificate for the '638 Patent stating that "Claims 1 and 13 are determined to be patentable as amended," that "Claims 2-12 and 14-22, dependent on an amended claim, are determined to be patentable," and that "New Claims 23-40 are added and determined to be patentable."  RingCentral lacks knowledge or information sufficient to form a belief about the truth of the remainder of the allegations in this paragraph and, on that basis, denies them.

7.      Denied.

8.      RingCentral admits that U.S. Patent No. 6,350,066 ("'066 Patent") is entitled "Systems And Methods For Storing, Delivering And Managing Message" and lists on its face Charles R. Bobo, II as inventor and a issue date of February 26, 2002.  RingCentral further admits that a copy of the '066 Patent is attached at Exhibit C to the Complaint. RingCentral lacks knowledge or information sufficient to form a belief about the truth of the remainder of the allegations in this paragraph and, on that basis, denies them.

9.      RingCentral admits that Exhibit D appears on its face to be a Reexamination Certificate for the '066 Patent stating that "Claims 1-35 are cancelled" and that "New claims 36-57 are added and determined to be patentable."  RingCentral lacks knowledge or information sufficient to form a belief about the truth of the remainder of the allegations in this paragraph and, on that basis, denies them.

10.     Denied.

11.     Denied.

12.     RingCentral admits that Exhibit E appears on its face to be a Claim Construction Order dated March 4, 2011 issued for the cases *j2 Global Communications, Inc., et al. v. Captaris, Inc., et al.*, Case No. 09-4150 DDP (AJWx) and *j2 Global Communications, Inc. v. EasyLink Services International Corporation*, Case No.09-4189 DDP (AJWx).  RingCentral further admits that Exhibit F appears on its face to be an order

dated July 19, 2011 denying a motion to reconsider the aforementioned Claim Construction Order.  RingCentral lacks knowledge or information sufficient to form a belief about the truth of the remainder of the allegations in this paragraph and, on that basis, denies them.

13.    RingCentral admits that U.S. Patent No. 7,020,132 ("'132 Patent") is entitled "Scalable Architecture For Transmission Of Messages Over A Network" and lists on its face Anand Narasimhan, Yaacov Shemesh, and Amit Kumar as inventors, j2 Global Communications, Inc. as assignee, and an issue date of March 28, 2006.  RingCentral further admits that a copy of the '066 Patent is attached at Exhibit G to the Complaint. RingCentral lacks knowledge or information sufficient to form a belief about the truth of the remainder of the allegations in this paragraph and, on that basis, denies them.

14.    Denied.

15.    RingCentral admits that it lists both RingCentral Office™ and RingCentral Fax™ on its website.  RingCentral admits that RingCentral Office™ provides access to voicemail over the Internet.  RingCentral further admits that both RingCentral Office™ and RingCentral Fax™ provide an Internet fax feature, which includes the ability to send and receive faxes over the Internet.   RingCentral lacks knowledge or information sufficient to form a belief about the truth of the remainder of the allegations in this paragraph and, on that basis, denies them.

16.    RingCentral admits that customers can receive by email incoming faxes as PDFs with RingCentral Fax™, in combination with other essential instrumentalities. RingCentral further admits that customers can receive voicemail message attachments with email notifications, in addition to receiving by email incoming faxes as PDFs, with RingCentral Office™, in combination with other essential instrumentalities.  RingCentral denies the remainder of the allegations in this paragraph.

17.    Denied.

18.    RingCentral admits that customers can access sent and received faxes online with RingCentral Fax™, in combination with other essential instrumentalities.

[CORRECTED] RINGCENTRAL'S ANSWER AND COUNTERCLAIMS TO
PLAINTIFFS' FIRST AMENDED COMPLAINT / CASE NO. 2:11-CV-04686-DDP -AJW

RingCentral admits that customers can access sent and received faxes online and can manage voice and fax messages with RingCentral Office™, in combination with other essential instrumentalities.  RingCentral denies the remainder of the allegations in this paragraph.

19.    Denied.

20.    RingCentral admits that customers can send faxes by email with RingCentral Fax™ and RingCentral Office™, in combination with other essential instrumentalities. RingCentral denies the remainder of the allegations in this paragraph.

21.    Denied.

22.    RingCentral admits that it received letters listing the '066 Patent, the '638 Patent, and the '132 Patent on or around November 2009.  RingCentral denies the remainder of the allegations in this paragraph.

23.    Denied.

24.    Denied.

## COUNT I

CLAIM FOR PATENT INFRINGEMENT

UNDER 35 U.S.C. § 271 ('638 PATENT)

25.    RingCentral admits that it has offered to sell and provide, has sold and provided, and continues to offer to sell and provide and to sell and provide RingCentral Office™ and RingCentral Fax™ in the Central District of California and in the United States.  RingCentral denies the remainder of the allegations in this paragraph.

26.    Denied.

27.    Denied.

28.    Denied.

29.    Denied.

///

///

///

## COUNT II

### CLAIM FOR PATENT INFRINGEMENT

### UNDER 35 U.S.C. § 271 ('066 PATENT)

30.     RingCentral admits that it has offered to sell and provide, has sold and provided, and continues to offer to sell and provide and to sell and provide RingCentral Office™ and RingCentral Fax™ in the Central District of California and in the United States. RingCentral denies the remainder of the allegations in this paragraph.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

## COUNT III

### CLAIM FOR PATENT INFRINGEMENT

### UNDER 35 U.S.C. § 271 ('132 PATENT)

35.     RingCentral admits that it has offered to sell and provide, has sold and provided, and continues to offer to sell and provide and to sell and provide RingCentral Office™ and RingCentral Fax™ in the Central District of California and in the United States. RingCentral denies the remainder of the allegations in this paragraph.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense: NonInfringement

40.     Plaintiffs are not entitled to any relief against RingCentral because RingCentral has not infringed any valid and enforceable claim of the patents-in-suit.

///

///

### Second Affirmative Defense: Invalidity

41.     One or more claims of the patents-in-suit are invalid and/or unenforceable for failing to meet one or more requirements of the requisite statutory and decisional requirements and/or conditions for patentability under title 35 of the United States Code, including without limitation, §§ 102, 103, 111, 112, 115, 116, and 256.

### Third Affirmative Defense: Laches

42.     One or more of claims of the patents-in-suit are unenforceable against RingCentral due to laches.

### Fourth Affirmative Defense: Waiver

43.     One or more of claims of the patents-in-suit are unenforceable against RingCentral due to waiver.

### Fifth Affirmative Defense:  Unclean Hands

44.     One or more of claims of the patents-in-suit are unenforceable against RingCentral due to Plaintiffs' own unclean hands.

### COUNTERCLAIMS

For their Counterclaims against Plaintiffs j2 Global Communications, Inc. and Advanced Messaging Technologies, Inc., Counter-Plaintiffs RingCentral, Inc. allege as follows:

### PARTIES

45.     RingCentral is a corporation existing and organized under the laws of the State of California, with a principal place of business at 999 Baker Way, Fifth Floor, San Mateo, California, 94404.

46.     On information and belief, j2 Global Communications, Inc. ("j2") is a corporation organized under the law of the State of Delaware with its principal place of business at 6922 Hollywood  Boulevard, Suite 500, Los Angeles, California, 90028.

47.     On information and belief, Advanced Message Technologies, Inc. (collectively with j2, "Plaintiffs") is a corporation organized under the law of the State of

Delaware with its principal place of business at 6922 Hollywood Boulevard, Suite 500, Los Angeles, California, 90028 and is a wholly-owned subsidiary of j2.

## JURISDICTION AND VENUE

48.    This Court has subject matter jurisdiction over these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, 1367, and 35 U.S.C. §§ 271, 281, and 283-285.

49.    Plaintiffs submitted to jurisdiction in this Court by filing its original Complaint.

50.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## FACTS

**A.    j2's Infringement of RingCentral's Patent**

51.    RingCentral is the owner, by assignment of all rights, titles, and interest in and to U.S. Patent No. 7,702,669 ("'669 Patent"). The '669 Patent, issued April 20, 2010, is entitled "Synchronization In Unified Messaging Systems" and lists as its inventors Vlad Vendrow and Vlad Shmunis. A copy of the '669 Patent is attached hereto as Exhibit A.

52.    The claims of the '669 Patent are valid and enforceable.

53.    j2 sells and provides "Onebox," an "all-in-one virtual phone solution featuring an auto-attendant, professional greetings, voicemail, online faxing, and conference calling allowing you to easily manage all business communications." Onebox provides "Unified Messaging," which performs synchronization. j2 sells and provides Onebox in the United States and in this District.

54.    Onebox directly infringes one or more claims of the '669 Patent, including, but not limited to, Claim 11.

55.    Unless enjoined by this Court, j2 will continue to infringe the claims of the '669 patent.

**B.    j2's Unlawful Conduct**

56.    Under the Telecommunications Act of 1996, carriers of "telecommunications services" are subject to certain requirements. One such requirement is that a carrier of

telecommunications services must "port" a customer's telephone numbers—i.e., transfer numbers to another carrier— "without impairment of quality, reliability, or convenience."

57.     In providing its Onebox product, j2 is a carrier of telecommunications services.  j2 touts its Onebox product as a "virtual PBX" service and as providing telephone numbers and calling card and conference call services—all of which the FCC regulates as telecommunications services.

58.     But, on information and belief, j2 does not comply with the portability requirements imposed by the FCC.  Thus, when porting a customer's number to another carrier, j2 imposes significant porting and other fees and delays (and reserves the right not to port its customers' numbers at all).

59.     By this unlawful conduct, j2 gains from an unfair competitive advantage. RingCentral is a direct competitor of j2 (and, notably, does comply with the porting requirements imposed by the FCC).  As a consequence, potential RingCentral customers face undue impediments in transferring their numbers to RingCentral, RingCentral loses customers and revenues as a result, RingCentral further loses revenue due to undue delay in porting customers' numbers to RingCentral, and j2 enjoys revenues to which it is not entitled and prevents its customers from switching to other telecommunications services such as RingCentral.

**C.      Plaintiffs' Action For Patent Infringement**

60.     Plaintiffs claim to be the owners of all rights, titles, and interest in and to the '638 Patent, the '066 Patent, and the '132 Patent.

61.     Plaintiffs have accused RingCentral of infringement of the patents-in-suit.

62.     An actual case or controversy exists between the parties concerning the infringement, validity, and enforceability of one or more claims of the '638 Patent, the '066 Patent, and the '132 Patent.

///

///

///

## COUNT I

### Patent Infringement

63.     RingCentral restates and incorporates by reference as if fully set forth herein the preceding paragraphs of the Counterclaims above.

64.     j2 has offered to sell and provide, has sold and provided, and now sells and provides and offers to sell and provide, in the United States and in this District, Onebox, which directly infringes one or more claims of the '669 Patent, including, but not limited to, Claim 11.

65.     j2 has therefore damaged RingCentral in an amount to be proven at trial and at least in the amount of a reasonable royalty.

66.     Unless enjoined by this Court, j2 will continue to infringe the claims of the '669 patent.

## COUNT II

### Unfair Competition Under Cal. B. & P. Code §§ 17200, *et seq.*

67.     RingCentral restates and incorporates by reference as if fully set forth herein the preceding paragraphs of the Counterclaims above.

68.     j2 has engaged in and continues to engage in unlawful conduct by failing to satisfy the portability requirements imposed by the FCC on carriers of telecommunications services.  On information and belief, j2 has engaged in this unlawful conduct with the intent of gaining an unfair competitive advantage over its competitors, including RingCentral.

69.     By these acts, j2 has engaged in unlawful and unfair business practices that have injured and will continue to injure RingCentral in its business and property, in violation of California Business and Professions Code §§ 17200, *et seq.*

70.     RingCentral seeks equitable relief resulting from Defendants' unfair competition.

## COUNT III

### Declaratory Relief Regarding Non-Infringement of '638 Patent

71.   RingCentral restates and incorporates by reference as if fully set forth herein the preceding paragraphs of the Counterclaims above.

72.   Based on Plaintiffs' filing of this action and RingCentral's denials of the allegations in Plaintiffs' Complaint, an actual controversy has arisen and now exists between the parties concerning the infringement of the '638 Patent.

73.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, RingCentral requests a declaration by the Court that it has not and is not infringing any claim of the '638 Patent.

## COUNT IV

### Declaratory Relief Regarding Invalidity of the '638 Patent

74.   RingCentral restates and incorporates by reference as if fully set forth herein the preceding paragraphs of the Counterclaims above.

75.   Based on Plaintiffs' filing of this action and RingCentral's denials of the allegations in Plaintiffs' Complaint, an actual controversy has arisen and now exists between the parties concerning the validity of the '638 Patent.

76.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, RingCentral requests a declaration by the Court that each asserted claim in the '638 Patent is invalid and/or unenforceable for failure to comply with the requirements and/or conditions for patentability under title 35 of the United States Code, including without limitation, §§ 102, 103, 111, 112, 115, 116, and 256.

## COUNT V

### Declaratory Relief Regarding Non-Infringement of the '066 Patent

77.   RingCentral restates and incorporates by reference as if fully set forth herein the preceding paragraphs of the Counterclaims above.

78.     Based on Plaintiffs' filing of this action and RingCentral's denials of the allegations in Plaintiffs' Complaint, an actual controversy has arisen and now exists between the parties concerning the infringement of the '066 Patent.

79.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, RingCentral requests a declaration by the Court that it has not and is not infringing any claim of the '066 Patent.

## COUNT VI

### Declaratory Relief Regarding Invalidity of the '066 Patent

80.     RingCentral restates and incorporates by reference as if fully set forth herein the preceding paragraphs of the Counterclaims above.

81.     Based on Plaintiffs' filing of this action and RingCentral's denials of the allegations in Plaintiffs' Complaint, an actual controversy has arisen and now exists between the parties concerning the validity of the '066 Patent.

82.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, RingCentral requests a declaration by the Court that each asserted claim in the '066 Patent is invalid and/or unenforceable for failure to comply with the requirements and/or conditions for patentability under title 35 of the United States Code, including without limitation, §§ 102, 103, 111, 112, 115, 116, and 256.

## COUNT VII

### Declaratory Relief Regarding Non-Infringement of the '132 Patent

83.     RingCentral restates and incorporates by reference as if fully set forth herein the preceding paragraphs of the Counterclaims above.

84.     Based on Plaintiffs' filing of this action and RingCentral's denials of the allegations in Plaintiffs' Complaint, an actual controversy has arisen and now exists between the parties concerning the infringement of the '132 Patent.

85.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, RingCentral requests a declaration by the Court that it has not and is not infringing any claim of the '132 Patent.

## COUNT VIII

## Declaratory Relief Regarding Invalidity of the '132 Patent

86.     RingCentral restates and incorporates by reference as if fully set forth herein the preceding paragraphs of the Counterclaims above.

87.     Based on Plaintiffs' filing of this action and RingCentral's denials of the allegations in Plaintiffs' Complaint, an actual controversy has arisen and now exists between the parties concerning the validity of the '132 Patent.

88.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, RingCentral requests a declaration by the Court that each asserted claim in the '132 Patent is invalid and/or unenforceable for failure to comply with the requirements and/or conditions for patentability under title 35 of the United States Code, including without limitation, §§ 102, 103, 111, 112, 115, 116, and 256.

## RESERVATION OF COUNTERCLAIMS

89.     RingCentral reserves the right to assert any other counterclaim that discovery may reveal.

## PRAYER FOR RELIEF

WHEREFORE, RingCentral prays for the following:

1.     Dismissal of the First Amended Complaint (and any operative amendment thereto) in its entirety, with prejudice;

2.     An order entering judgment in favor of RingCentral on each of its counterclaims and affirmative defenses;

3.     An order denying all Plaintiffs' claims and that Plaintiffs take nothing;

4.     A declaratory judgment that RingCentral has not infringed, and is not infringing, any valid and enforceable claim of the '638 Patent, the '066 Patent, and the '132 Patent

5.     A declaratory judgment that the claims of the '638 Patent, the '066 Patent, and the '132 Patent are invalid.

6.     A permanent injunction against j2's continued infringement of the '669 patent;

7.     An award of damages for infringement of the '669 patent in an amount of not less than a reasonable royalty.

8.     Actual and/or statutory damages in an amount to be determined at trial;

9.     Recover j2's profits;

10.    In injunction requiring j2 to comply with FCC regulations imposed on carriers of telecommunications services;

11.    Prejudgment and post-judgment interests on damages;

12.    An award of costs;

13.    An order, pursuant to 35 U.S.C. § 285, finding that this is an "exceptional case" and awarding RingCentral its reasonable attorneys' fees, expenses, and costs incurred in this action;

14.    Such other further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, RingCentral demands a trial by jury of all issues so triable.


Dated:  October 21, 2011                              DURIE TANGRI LLP


                                                      By:  _____*/s/ Sonali D. Maitra*_____
                                                          CLEMENT S. ROBERTS
                                                          JOSEPH C. GRATZ
                                                          SONALI D. MAITRA

                                                      WILSON SONSINI GOODRICH & ROSATI
                                                      STEFANI E. SHANBERG (SBN 206717)
                                                      sshanberg@wsgr.com
                                                      650 Page Mill Road
                                                      Palo Alto, CA 94304-1050
                                                      Telephone:  (650) 493-9300
                                                      Facsimile:  (650) 565-5100

                                                      Attorneys for Defendant and Counter Claimant
                                                      RINGCENTRAL. INC.

# Exhibit A

US007702669B2

(12) **United States Patent**      (10) **Patent No.:**    **US 7,702,669 B2**
Vendrow et al.                 (45) **Date of Patent:**     **Apr. 20, 2010**

(54) **SYNCHRONIZATION IN UNIFIED MESSAGING SYSTEMS**

(75) Inventors: **Vlad Vendrow**, Redwood Shores, CA (US); **Vlad Shmunis**, Hillsborough, CA (US)

(73) Assignee: **RingCentral, Inc.**, San Mateo, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1068 days.

(21) Appl. No.: **11/219,532**

(22) Filed: **Sep. 2, 2005**

(65) **Prior Publication Data**

US 2006/0062356 A1     Mar. 23, 2006

**Related U.S. Application Data**

(60) Provisional application No. 60/607,220, filed on Sep. 2, 2004.

(51) **Int. Cl.**
     *G06F 17/30*      (2006.01)

(52) **U.S. Cl.** .................................................... **707/620**

(58) **Field of Classification Search** ................... 707/10, 707/200–204; 455/413, 414.1; 379/93.24, 379/88.13, 100.08; 714/20; 718/104; 709/206, 709/218; 726/26
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 6,643,669 | B1 * | 11/2003 | Novak et al. | ................. | 707/201 |
| 7,024,474 | B2 * | 4/2006 | Clubb et al. | ................. | 709/223 |
| 7,047,525 | B2 * | 5/2006 | Prunty et al. | ................. | 717/137 |
| 7,076,558 | B1 * | 7/2006 | Dunn | ......................... | 709/229 |
| 2002/0120697 | A1 * | 8/2002 | Generous et al. | ........... | 709/206 |
| 2005/0262456 | A1 * | 11/2005 | Deen et al. | .................. | 715/513 |

* cited by examiner

*Primary Examiner*—Diane Mizrahi
(74) *Attorney, Agent, or Firm*—Fish & Richardson P.C.

(57) **ABSTRACT**

A unified messaging system, method, apparatus, individual components and the like are disclosed. The unified messaging system comprises a server, a client and a synchronization application for synchronizing voicemail messages and fax messages on both the server and the client is disclosed. The server messages may include received messages and sent messages, each of which is indexed according to their respective indices and read/unread statuses. Similarly, the client messages may include received messages and sent messages, each of which is indexed according to their respective indices and read/unread statuses.

**21 Claims, 5 Drawing Sheets**





FIG. 1



FIG. 2A



201

RECEIVE CLIENT REQUEST          203

PARSE RECEIVED REQUEST
AND IDENTIFY MESSAGES          205

ACCESS AND MANIPULATE
IDENTIFIED MESSAGES          207

SEND RESPONSE TO THE
CLIENT          209

FIG. 2B



104

CLIENT

CLIENT MESSAGE ACCESS MODULE

CLIENT MESSAGE STORAGE MODULE

304

302

SERVER INTERACTION MODULE

306

SYNCHRONIZATION APPLICATION

308

FIG. 3A



FIG. 3B

US 7,702,669 B2

**1**

## SYNCHRONIZATION IN UNIFIED MESSAGING SYSTEMS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a nonprovisional application of and claims priority to U.S. application Ser. No. 60/607,220, filed on Sep. 2, 2004.

### BACKGROUND

The present application relates generally to messaging systems.

A messaging system can be used to convey information from a sender to a recipient. Conventional messaging systems use various input and delivery mechanisms including telephones, pagers, computers, recorders, answering machines and other systems to formulate and deliver the message content.

### SUMMARY OF THE INVENTION

According to one aspect, a unified messaging system includes a server configured to store a plurality of server messages, a client configured to store a plurality of client messages and a synchronization application which synchronizes the client messages with the server messages associated with the client. The server messages includes voicemail messages and fax messages for a client, and the client messages includes voicemail messages and fax messages for the client and correspond generally to the server messages.

In some implementations, one or more of the following features may be present. The server messages include received messages and sent messages, and the client messages include received messages and sent messages. Each of the server messages includes a server message index and a read/unread status, each of the client messages includes a client message index and a read/unread status, and synchronizing the client messages with the server messages includes synchronizing server message indices with client message indices, and server message read/unread statuses with client message read/unread statuses

In another implementation, the synchronization application determines whether a server message on the client has previously been synchronized to establish a corresponding client message on the client.

According to another aspect, a synchronization method includes storing a plurality of server messages containing voicemail messages and fax messages on a server, storing a plurality of client messages containing voicemail messages and fax messages corresponding generally to the server messages on a client, and synchronizing the client messages with the server messages.

In a related aspect, a synchronization method includes storing a plurality of server messages containing voicemail messages and fax messages on a server, storing a plurality of client messages containing voicemail messages and fax messages corresponding generally to the server messages on a client, and generating an identifier on the client and the server at each synchronization.

In various implementations, one or more of the following advantages may be present. Based on the results of the discrepancy assessment established during the synchronization, the synchronization application creates a list of synchronization actions that can be performed in order to synchronize the messages on the server with the messages on the client with-

**2**

out having a need to maintain a history of all prior messages on the client. The state of messages on the client may also be updated so that requests may be sent to the server to update the state of messages on the server.

Other features and advantages will be readily apparent from the following detailed description, the accompanying drawings and the claims.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a unified messaging system according to one implementation.

FIG. **2A** is a block diagram of a server.

FIG. **2B** is a flowchart illustrating a sequence of steps for processing a client request on a server.

FIG. **3A** is a block diagram of a client.

FIG. **3B** is a flowchart illustrating a client-based synchronization process.

Like reference numbers and designations in the various drawings indicate like elements.

### DETAILED DESCRIPTION

As shown in FIG. **1**, a unified messaging system **100** integrates several different communications media to allow a user **110** to send and retrieve voice **112***a*, fax **112***b*, and messages **112***c* (e.g., e-mail, text, etc.) from a single interface, whether it be a phone **104***a*, a fax machine **104***b*, or a personal computer **104***c*.

A unified messaging system **100** includes a server **102** that can store messages **108** of different types and of different communications media (e.g., received messages, sent messages, voicemail messages, fax messages, etc.). Messages **108** are grouped into message clusters **106**, or mailboxes, that are associated with individual users **110**, or groups of users. In one implementation, each individual message **108** includes, but is not limited to, a unique message index (e.g. identifiers), message content (e.g., voice, video, data), message properties (e.g., date and time, sender information), and message status (e.g., read, unread). A particular combination of message indexes and message statuses of all messages **108** in a given message cluster **106** is referred to as the state of the messages in the given cluster **106**.

The unified message system **100** further includes one or more clients **104** for a given user **110**. A client **104** can store local copies of the messages **108** that are stored on the server **102**. A client **104** can include a synchronization application (discussed in greater detail below) that periodically synchronizes the client **104** with the server **102** to ensure that the state of messages on the server **102** is the same as the state of messages on the client **104**. Discrepancies between the state of messages on the server **102** and the state of messages on the client **104** arise as a result of the user **110** deleting a message (e.g., on the server **102** and not deleting the message on the client **104**, and visa versa), messages arriving at the server **102** and not being loaded on the client **104**, the user **110** viewing a message on a client device or at the server **102**, and so on. In one implementation, the synchronization application is not an e-mail application.

FIG. **2A** illustrates components of a server **102** according to one implementation. The server **102** includes a server message storage module **202**, which manages the storage of messages on the server **102**. The server message storage module **202** can be an actual location where the messages are stored. Alternatively, the server message storage module **202** can contain information as to where and how the messages are stored on the server **102** or an external server.

3

The server **102** further includes an autodelete module **200**, which automatically deletes certain messages **108** from the server **102** at predetermined intervals. For instance, the server **102** can be configured such that a given message **108** that arrives at the server **102** is automatically deleted from the server ten days after arriving. The autodelete module **202** can be a part of the server message storage module **202**.

The server **102** further includes a server message access module **204**, which is an interface to the server message storage module **202**. The content and the properties of a given message in the server message storage module **202** are accessed and manipulated through the server message access module **204**. The server message storage module **202** can be a part of the server message access module **204**.

The server **102** further includes a client interaction module **206** through which the server **102** interacts with a client **104**. In particular, the server **102** uses the client interaction module **206** to receive and process requests from a client **104**. In one implementation, the client interaction module **206** includes an Internet Server Application Program Interface (ISAPI) application **216** for receiving the requests and an XML parser **226** for processing the requests. The client interaction module **206** can also include a telephone access interface (not shown), e.g., HTTP stream interface, and a web access (not shown), e.g., IVR interface.

Accordingly, as shown in a flow chart in FIG. 2B, the steps **201** for processing a request from a client **104** on the server **102** include receiving the request through, for example, the ISAPI application **216** (step **203**). Processing the client's request further includes parsing the request using, for example, the XML parser **226** (step **205**), which identifies the messages in the server message storage module **202** that need to be accessed. Processing the client's request further includes accessing the identified messages through the server message access module **204** and manipulating the identified messages in the server message storage module **202** per the client's request (**207**). Optimally, processing the client's request further can include sending a response to the client **104** (step **209**). For instance, the response can include information requested by the client **104** and/or information as to whether the request was processed successfully or if there were errors.

FIG. 3A illustrates components of a client **104** according to one implementation. The client **104** includes a client message storage module **302**, which manages the storage of messages on the client **104**. The client message storage module **302** can be an actual location where the messages are stored. Alternatively, the client message storage module **302** can contain information as to where and how the messages are stored on the client **104** or an external device.

The client **104** further includes a client message access module **304**, which is an interface to the client message storage module **302**. The content and the properties of a given message in the client message storage module **302** are accessed and manipulated through the client message access module **304**. The client message storage module **302** can be part of the client message access module **304**.

The client **104** further includes a server interaction module **306** through which the client **104** interacts with the server **102**. In particular, the client **104** sends requests to the server **102** and receives the server's responses through the server interaction module **306**. To send a request to the server **102**, the client **104** first uses the server interaction module **306** to connect to the server **102** by establishing, for example, an HTTP connection. Subsequently, the server interaction module **306** exchanges data with the server **102** specific to the request using, for example, an XML parser.

4

The client **104** further includes a synchronization application **308**, which is responsible for synchronizing the messages on the server **102** with the messages on the client **104**. In particular, the synchronization application **104** receives the state of messages in the server message storage module **202** on the server **102** and compares it with the state of the messages in the client message storage module **302** on the client **104**. The synchronization application **308** further identifies a set of actions that need to be performed to synchronize the messages on the server **102** with the messages on the client **104** and subsequently performs those actions.

A process **301** that the synchronization application **308** uses to synchronize the messages on the server **102** with the messages on the client **104**, according to one implementation, is outlined in more detail in FIG. 3B. Referring now to FIGS. **1** and **3B**, the synchronization application **308** on the client **104** initiates synchronization (step **303**) by establishing, for example, an HTTP connection with the server **102**. A variety of conditions can cause the synchronization application **308** on the client **104** to initiate synchronization. For instance, synchronization application **308** on the client **104** can initiate synchronization when it receives a new message notification from the server **102**. The synchronization application **308** on the client **104** can also initiate synchronization when a message on the client **104** is deleted.

In one implementation, an unique ID is generated at each synchronization and saved on both the client **104** and the server **102**. Prior to initiating the next synchronization, the client **104** transfers this unique ID to the server **102**. The synchronization application **308** on the client **104** can proceed to synchronize the message on the client **104** and the server **102** after the server **102** compares and determines that the unique ID received from the client **104** and that saved on the server **102** corresponds. If the unique ID received from the client **104** and that is saved on the server **102** do not correspond, synchronization application **308** does not initiate a synchronization so as to avoid any unnecessary synchronization.

Other conditions that cause the synchronization application **308** on the client **104** to initiate synchronization can include, but are not limited to, the user **110** requesting synchronization, the client **104** connecting to the server **102**, the state of the client **104** changing from offline to online, or a message on the client **104** changing status, a timer associated. Also, synchronization can be performed at predetermined intervals and initiated, for instance, by a synchronization timer.

Once synchronization is initiated (step **303**), the synchronization application **308** on the client **104** sends a request to the server **102** through the server interaction module **306** to receive the state of the messages stored on the server **102** (step **305**). The server **102** processes the request according to the steps outlined in reference to FIG. 2B and can send a response containing information about the state of the messages stored on the server **102** to the client **104**.

Once the client **104** receives the state of the messages stored on the server **102** (step **307**), the synchronization application **308** identifies the state of the messages stored on the client **104** (step **309**) using the client message access module **304**.

Subsequently, the client's synchronization application **308** assesses the discrepancies between the state of messages stored on the server **102** and the state of messages stored on the client **104** (step **311**). In one implementation the discrepancy assessment involves comparing the indexes of the messages stored on the server **102** with the indexes of the messages stored on the client **104**. For example, if the indexes of

US 7,702,669 B2

5

the messages on the server **102** are **1001**, **1002**, **1003** and **1004**, and the indexes of the messages on the client **104** are **1001**, **1002**, and **1004**, the message with index **1003** has been deleted from the client **104** but not from the server **102**. The discrepancy assessment can further include comparing the statuses of the messages with the same indexes on the client **104** and on the server **102**.

Based on the results of the discrepancy assessment (step **311**) the synchronization application **308** creates a list of synchronization actions that need to be performed in order to synchronize the messages on the server **102** with the messages on the client **104** (step **313**). The synchronization actions can include, but are not limited to, deleting messages on the client **104**, changing the status of a given message of the client **104**, sending a request to the server **102** to delete messages on the server **102**, sending a request to the server **102** to change the status of a given message on the server **102**. In one implementation, a list of synchronization actions is created based on the following rules:

1) If a new message has been added on the server **102** since the last synchronization (e.g., a new message has been received), the message is added on the client **104**.

2) If a new message has been added on the client **104** since the last synchronization (e.g., a new message has been sent), the message is added on the server **102**.

3) If a message on the server **102** has been marked as "read" since the last synchronization, the corresponding message on the client **104** is also marked as "read".

4) If a message on the client **104** has been marked as "read" since the last synchronization, the corresponding message on the server **102** is also marked as "read".

5) If a message on the server **102** has been marked as "unread" since the last synchronization, the corresponding message on the client **104** is also marked as "unread".

6) If a message on the client **104** has been marked as "unread" since the last synchronization, the corresponding message on the server **102** is also marked as "unread".

7) If a message on the server **102** has been deleted since the last synchronization, and the deletion was not performed by the autodelete module **200**, the corresponding message on the client **104** is also deleted.

8) If a message on the client **104** has been deleted since the last synchronization, the corresponding message on the server **102** is also deleted.

Once the list of synchronization actions is created, the synchronization application **308** performs the synchronization actions in the list (step **315**). Performing synchronization actions in the list can include, but is not limited to, updating the state of messages on the client **104** and sending requests to the server **102** to update the state of messages on the server **102**.

The invention and all of the functional operations described in this specification can be implemented in digital electronic circuitry, or in computer software, firmware, or hardware, including the structural means disclosed in this specification and structural equivalents thereof, or in combinations of them. The invention can be implemented as one or more computer program products, i.e., one or more computer programs tangibly embodied in an information carrier, e.g., in a machine-readable storage device or in a propagated signal, for execution by, or to control the operation of, data processing apparatus, e.g., a programmable processor, a computer, or multiple computers. A computer program (also known as a program, software, software application, or code) can be written in any form of programming language, including compiled or interpreted languages, and it can be deployed in any form, including as a stand-alone program or as a module,

6

component, subroutine, or other unit suitable for use in a computing environment. A computer program does not necessarily correspond to a file. A program can be stored in a portion of a file that holds other programs or data, in a single file dedicated to the program in question, or in multiple coordinated files (e.g., files that store one or more modules, subprograms, or portions of code). A computer program can be deployed to be executed on one computer or on multiple computers at one site or distributed across multiple sites and interconnected by a communication network.

The processes and logic flows described in this specification, including the method steps of the invention, can be performed by one or more programmable processors executing one or more computer programs to perform functions of the invention by operating on input data and generating output. The processes and logic flows can also be performed by, and apparatus of the invention can be implemented as, special purpose logic circuitry, e.g., an FPGA (field programmable gate array) or an ASIC (application-specific integrated circuit).

Processors suitable for the execution of a computer program include, by way of example, both general and special purpose microprocessors, and any one or more processors of any kind of digital computer. Generally, a processor will receive instructions and data from a read-only memory or a random access memory or both. The essential elements of a computer are a processor for executing instructions and one or more memory devices for storing instructions and data. Generally, a computer will also include, or be operatively coupled to receive data from or transfer data to, or both, one or more mass storage devices for storing data, e.g., magnetic, magneto-optical disks, or optical disks. Information carriers suitable for embodying computer program instructions and data include all forms of non-volatile memory, including by way of example semiconductor memory devices, e.g., EPROM, EEPROM, and flash memory devices; magnetic disks, e.g., internal hard disks or removable disks; magneto-optical disks; and CD-ROM and DVD-ROM disks. The processor and the memory can be supplemented by, or incorporated in, special purpose logic circuitry.

To provide for interaction with a user, the invention can be implemented on a computer having a display device, e.g., a CRT (cathode ray tube) or LCD (liquid crystal display) monitor, for displaying information to the user and a keyboard and a pointing device, e.g., a mouse or a trackball, by which the user can provide input to the computer. Other kinds of devices can be used to provide for interaction with a user as well; for example, feedback provided to the user can be any form of sensory feedback, e.g., visual feedback, auditory feedback, or tactile feedback; and input from the user can be received in any form, including acoustic, speech, or tactile input.

The invention can be implemented in a computing system that includes a back-end component (e.g., a data server), a middleware component (e.g., an application server), or a front-end component (e.g., a client computer having a graphical user interface or a Web browser through which a user can interact with an implementation of the invention), or any combination of such back-end, middleware, and front-end components. The components of the system can be interconnected by any form or medium of digital data communication, e.g., a communication network. Examples of communication networks include a local area network ("LAN"), e.g., a wireless LAN, and a wide area network ("WAN"), e.g., the Internet.

The invention has been described in terms of particular embodiments, but other embodiments can be implemented and are within the scope of the following claims. For example,

**7**

the operations of the invention can be performed in a different order and still achieve desirable results. As one example, the process depicted in FIG. 3B does not require the particular order shown, or sequential order, to achieve desirable results (e.g., step 305 can follow steps 307 and 309). Furthermore, synchronization application 308 can run on the client 104, or on the server 102. Moreover, a portion of the synchronization application 308 can run on the client 104, and a portion of the synchronization application 308 can run on the server 102. In certain implementations, multitasking and parallel processing may be preferable.

What is claimed is:

1. A unified messaging system comprising:
a computer implemented server including a processor configured to store a plurality of server messages, the server messages including voicemail messages and fax messages for a client;
a client configured to store a plurality of client messages, the client messages including voicemail messages and fax messages for the client and corresponding to the plurality of server messages; and
a synchronization application for synchronizing the client messages with the server messages associated with the client including performing at least one synchronization action selected from a group comprising:
a read/unread status of a client message to read when a read/unread status of a corresponding server message is set to read, and unread when the read/unread status of the corresponding server message is set to unread; and
a read/unread status of a server message to read when a read/unread status of a corresponding client message is set to read, and unread when the read/unread status of the corresponding client message is set to unread.

2. The unified messaging system of claim 1, wherein the synchronization application excludes an e-mail application.

3. The unified messaging system of claim 1, wherein the server messages include received messages and sent messages, and the client messages include received messages and sent messages.

4. The unified messaging system of claim 1, wherein each of the server messages includes a server message index, and each of the client messages includes a client message index, and
synchronizing the client messages with the server messages includes synchronizing server message indices with client message indices.

5. The unified messaging system of claim 4, wherein synchronizing server message indices with client message indices comprises:
identifying server message indices;
identifying client message indices;
identifying one or more discrepancies between the server message indices and the client message indices; and
generating one or more synchronization actions based on the identified discrepancies.

6. The unified messaging system of claim 5, wherein generating one or more synchronization actions includes generating a synchronization action from a group comprising:
creating a new client message when a server message does not have a corresponding client message;
creating a new server message when a client message does not have a corresponding server message;
deleting a client message when a corresponding server message has been deleted; and
deleting a server message when a corresponding client message has been deleted.

**8**

7. The unified messaging system of claim 1, further comprising:
identifying server message read/unread statuses;
identifying client message read/unread statuses; and
identifying one or more discrepancies between the identified server message read/unread statuses and the identified client message read/unread statuses,
where the client messages and the server messages associated with the client are synchronized based on the one or more identified discrepancies.

8. The unified messaging system of claim 1, wherein the synchronization application determines whether a server message on the server has previously been synchronized to establish a corresponding client message on the client.

9. The unified messaging system of claim 8, wherein the server message and the corresponding client message are respectively deleted from the server and the client when the synchronization application determines that the server message on the server has previously been synchronized to establish a corresponding client message on the client.

10. The unified messaging system of claim 8, wherein the synchronization application deletes the corresponding client message on the client when the server message is determined to have been deleted since a last synchronization.

11. A unified messaging system comprising:
a computer implemented server including a processor configured to store a plurality of server messages, the server messages including voicemail messages and fax messages for a client;
a client configured to store a plurality of client messages, the client messages including voicemail messages and fax messages for the client and corresponding to the plurality of server messages; and
a synchronization application for synchronizing the client messages with the server messages associated with the client,
wherein the synchronization application determines whether a server message on the server has previously been synchronized to establish a corresponding client message on the client, and
wherein the server message is downloaded to the client when the synchronization application determines that the server message on the server has not previously been synchronized to establish a corresponding client message on the client.

12. A synchronization method comprising:
storing a plurality of server messages containing voicemail messages and fax messages on a server;
storing a plurality of client messages containing voicemail messages and fax messages corresponding to the server messages on a client; and
synchronizing the client messages with the server messages using a processor including performing at least one synchronization action selected from a group comprising:
setting a read/unread status of a client message to read when a read/unread status of a corresponding server message is set to read; and
setting a read/unread status of a server message to read when a read/unread status of a corresponding client message is set to read.

13. The method of claim 12, further comprising indexing the server messages as server message indices and the client messages as client message indices,
wherein synchronizing the client messages with the server messages includes synchronizing the server message indices with the client message indices.

US 7,702,669 B2

9

**14**. The method of claim **13**, wherein synchronizing the client messages with the server messages comprises:

identifying server message indices;

identifying client message indices;

identifying one or more discrepancies between the server message indices and the client message indices; and

generating one or more synchronization actions based on the identified discrepancy.

**15**. The method of claim **14**, wherein generating one or more synchronization actions includes generating at least one synchronization action from a group comprising:

creating a new client message when a server message does not have a corresponding client message;

creating a new server message when a client message does not have a corresponding server message;

deleting a client message when a corresponding server message has been deleted; and

deleting a server message when a corresponding client message has been deleted.

**16**. The method of claim **12**, wherein synchronizing the client messages with the server messages includes setting the read/unread status of both the client message and the server message to read when the read/unread status of either the client message or the server message shows a read status.

**17**. The method of claim **16**, further comprising:

identifying server message read/unread statuses;

identifying client message read/unread statuses; and

identifying one or more discrepancies between the server message read/unread statuses and the client message read/unread statuses,

where synchronizing the client messages with the server messages is performed based on the one or more identified discrepancies.

**18**. The method of claim **12**, wherein synchronizing the client messages with the server messages includes determin-

10

ing whether a server message has previously been synchronized with a corresponding client message.

**19**. A method comprising:

storing a plurality of server messages containing voicemail messages and fax messages on a server;

storing a plurality of client messages containing voicemail messages and fax messages corresponding to the server messages on a client; and

synchronizing the client messages with the server messages using a processor,

wherein synchronizing the client messages with the server messages includes:

determining whether there is an extra message on the server that does not have a corresponding message on the client, and is more recent than a prior synchronization; and

determining whether at least one server message has previously been synchronized with a corresponding client message, and when the at least one server message on the server has not previously been synchronized with a corresponding client message on the client, the method further comprising:

downloading at least one server message to the client after determining the at least one server message on the server has not previously been synchronized to establish a corresponding client message on the client.

**20**. The method of claim **19**, further comprising downloading the extra message to the client after determining the extra message that does not have a corresponding message on the client is more recent than the prior synchronization.

**21**. The method of claim **19**, further comprising deleting the extra message from the server after determining the extra message that does not have a corresponding message on the client is not more recent than the prior synchronization.

*     *     *     *     *